**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:25-cr-00251-JEB** |
| **JAN CAREY,** | |
| **Defendant.** | |

**DEFENDANT'S MOTION TO DISMISS BOTH COUNTS IN THE INFORMATION**
**PURSUANT TO FED. R. CRIM. P. 12(b)**

Defendant Jan "Jay" Carey moves this Court pursuant to Fed. R. Crim. P. 12(b) to dismiss the charges against him. Rule 12 permits a party to raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. Fed. R. Crim. P. 12(b). Mr. Carey advances two arguments herein that compel the dismissal of the charges.

First, the general wilderness regulations which Mr. Carey is alleged to have violated are inapplicable as a matter of law to the alleged conduct, i.e., the burning of an American flag as an act of political expression and demonstration in Lafayette Park. Alternately, the regulations are ambiguous and must be interpreted in favor of Mr. Carey under the rule of lenity and the doctrine of constitutional avoidance, as well as to prevent the regulatory framework from being impermissibly vague.

Second, the prosecution against Mr. Carey is vindictive in violation of the Due Process clause of the Fifth Amendment. The charges must therefore be dismissed due to "a defect in instituting the prosecution." Fed. R., Crim. P. 12(b)(3)(A).

1

Mr. Carey, a veteran of the U.S. Army, is being charged and prosecuted because he expressed a point of view in opposition to that of the President of the United States and in defense of Americans' freedom of expression, by burning of the flag. His expression, i.e., burning of an American flag, with which the President disagrees and characterizes as "offensive and provocative" in expressive content, is being punished by reach to inapplicable regulations in service to a presidential executive order that explicitly and unconstitutionally targets specific disfavored expression. The President of the United States recently declared his intention to suppress lawful speech with regard to the constitutional right to flag-burning as a matter of protected expression, stating: "We took the freedom of speech away." This is an improper and vindictive prosecution that should be dismissed.

**Background**

**A. Facts**

Mr. Carey is charged in Count One with lighting and maintaining a fire, not in a designated area and receptacle and under conditions established by the superintendent, in violation of 18 U.S.C. § 1865(a), 54 U.S.C. § 100751(c) and 36 C.F.R. § 2.13(a)(3)[1]; and in Count Two of lighting, tending, and using a fire in a manner that threatened, caused damaged to, and resulted in the burning of property, real property, and park resources, and created a public safety hazard, in violation of 18 U.S.C. § 1865(a), 54 U.S.C.§ 100751(c) and  36 C.F.R. § 2.13(a)(3).

---

[1] Both Counts of the Government's information cite to C.F.R § 2.13(a)(3), but for the purposes of this motion defense counsel presumes that the Government intended to cite C.F.R § 2.13(a)(1), the provision of § 2.13 that prohibits "Lighting or maintaining a fire, except in the designated areas or receptacles and under conditions that may be established by the government."

On August 25, 2025, President Donald Trump signed Executive Order 14,341, titled "Prosecuting Burning of the American Flag." The President decreed that his administration would "act to restore respect and sanctity to the American Flag and prosecute those who incite violence or otherwise violate our laws while desecrating this symbol of our country, to the fullest extent permissible under any available authority." Exec. Order No. 14,341 90 Fed. Reg 42,127 (emphasis added).  Immediately after acknowledging flag-burning's protected status under the First Amendment, the executive order outlined new measures to "combat" the exercise of a constitutionally protected right. President Trump ordered his Attorney General to "vigorously prosecute those who violate our laws in ways that involve desecrating the American Flag." *Id.*

The order commanded executive departments and agencies to search for state and local laws that could be used to punish the disfavored speech, specifically suggesting "open burning restrictions, disorderly conduct laws, or destruction of property laws" as methods of attack. *Id.*, Section 2(b). The President also directed the State Department, Attorney General, and the Secretary of Homeland Security to use the country's immigration apparatus to punish any foreign national that engaged in this protected speech. *Id.,* § 2(d).

The executive order made it clear its intention was to criminally punish what the President believes to be the ideas expressed by burning a flag: "Desecrating it is uniquely offensive and provocative. It is a statement of contempt, hostility, and violence against our Nation- the clearest possible expression of opposition to the political union that preserves our rights, liberty and security." *Id.*, § 1. The Signing Statement accompanying the executive order stated that the purpose of the order was to "Combat[] Flag Desecration" and "prosecute those who desecrate this symbol of our freedom, identity, and strength to the fullest extent permissible." The White House, Fact Sheet: President Donald J. Trump Protects the American

Flag from Desecration, Aug. 25 2025, https://www.whitehouse.gov/fact-sheets/2025/08/fact-sheet-president-donald-j-trump-protects-the-american-flag-from-desecration/.

In the hours after the President signed this executive order, Jay Carey walked down to Lafayette Park in front of the White House. At approximately 6:20 P.M., Mr. Carey, using a small bullhorn, announced that he was a veteran of the United States Army and was about to burn an American flag as a protest against the President's unlawful executive order infringing on Americans' free speech rights under the First Amendment. He set a flag down on a brick area that was cleared of any objects, vegetation, or bystanders. Mr. Carey then set the flag on fire. At least four federal law enforcement officers gathered around Mr. Carey and listened to him speak; one used a handheld fire extinguisher they were carrying to extinguish the flag before other officers put Mr. Carey in handcuffs. Ex. A, Youtube Video.mp4 at 1:11 (elapsed) (tendered by Government in discovery).

United States Park Police command staff consulted with at least one Assistant United States Attorney as to how to charge Mr. Carey, orders that were then passed down to the arresting officers.  As Mr. Carey was detained, multiple law enforcement officers stood in a gaggle in Lafayette Park waiting to be told by superiors how to charge Mr. Carey.

U.S. Park Police Officer Francisco Pacheco told an unidentified white-shirted law enforcement officer "Command staff just, looks like they're having us handle it this way. They've got the AUSA." The white-shirted officer replied "Oh ok, gotcha. What we were thinking, this morning, was Trump signed an executive order this morning with the flag stuff, so I don't know if they were going to try to charge that federally or not." Officer Pacheco replied, "That's why I'm getting confirmation through the supervisors, I'm gonna do it through them." Ex. B, Francisco Pacheco's Body-Worn Camera at 19:04:57.

U.S. Park Police Officer Enrique Wong arrived at Lafayette Park approximately forty (40) minutes after Mr. Carey was handcuffed while he remained detained at the park. Officer Wong told U.S. Park Police Officer Andrew Patton "So the President just today signed an executive order that says we're arresting him. We got that going for us. The executive order is signed." Ex. C, Enrique Wong's Body-Worn Camera at 19:01:20. Officer Wong is listed as the Supervisor on the Park Police's arrest report for Mr. Carey. Ex. D, U.S. Park Police Incident Report No. PP25114469 at 4.

**B. The Regulatory Framework**

Mr. Carey is charged with two counts of violating regulations, each of which is found in Title 36, Chapter I, Part 2 of the Code of Federal Regulations pertaining generally to wilderness areas under the stewardship of the Department of Interior, National Park Service.[2]

The structure of Chapter I is divided into multiple parts. Parts 1 through 5 are general regulations that "deal[] with uses typical of wilderness areas, such as Yellowstone Park." *United States v. Doe*, 968 F.2d 86, 89 (1992); *see also* 48 Fed. Reg. 30252 (1983) (Part 2 is part of a group of regulations to generally "provide guidance and controls for public use and recreational activities (*e.g.*, camping, fishing, hunting, winter activities, boating) in areas administered by the National Park Service"). The provisions within Part 2 include restrictions on the use of "[w]eapons, traps and nets," 36 C.F.R. § 2.4, the "[g]athering of plants or plant parts by federally recognized Indian tribes," *id.* §2.6, and "[f]ires," *id.* § 2.13. Part 2 also contains regulations

---

[2] Mr. Carey has been charged pursuant to 18 U.S.C. § 1865(a) and 54 U.S.C. § 100751(c), which together impose "[c]riminal penalties," 54 U.S.C. § 100751(c), on any person who "violates any regulation authorized by section 100751(a) of title 54." 18 US.C. § 1865(a). The regulations Mr. Carey is alleged to have violated are 36 C.F.R §§ 2.13(a)(1) and (2). These regulations form the operative law for Mr. Carey's purported infraction, while the U.S. Code provisions create penalties for violating those regulations.

generally applicable to "[d]emonstrations and designated available park areas." *Id.* §§ 2.51(b), (c), (d).

"The entire set of regulations [in Part 2] deals with uses typical in wilderness areas, such as Yellowstone Park, . . . not for urban enclaves such as Lafayette Park." *United States v. Doe*, 968 F.2d 86, 89 (1992).

Part 7 of Chapter I contains "Special Regulations" which supplant the general wilderness regulations where applicable to meet the interests of particular areas under the stewardship of the National Park Service. The regulatory framework is express that the general regulations in Part 2 are modified and can be relaxed by Part 7 special regulations. "The regulations contained in Part 7 . . . are special regulations prescribed for specific park areas. Those regulations may amend, modify, relax, or make more stringent the regulations contained in Parts 1 through 5" of the chapter. 36 C.F.R. § 1.2(c); 48 Fed. Reg. 30252 (same).

Part 7 establishes such special regulations as are applicable to the parks within the National Capital Region, including Lafayette Park. These detailed regulations address the unique considerations of "urban enclaves such as Lafayette Park" and that park's role as "a situs . . . designated as a 'public forum' for First Amendment purposes." *Doe*, 968 F.2d at 89.

Highly specific regulations are set forth at 36 C.F.R. § 7.96 regarding parkland within the National Capital Region, with a comprehensive[3] set of regulations for expressive or

---

[3] As it pertains to demonstrations, § 7.96 requires permits for any demonstration involving "25 persons" or more and sets forth a scheme for the issuance of such permits distinct from the process outlined in § 2.51. 36 C.F.R. §§ 7.96(g)(2), (3). It provides incredibly detailed requirements for demonstrations ranging from how many people may demonstrate in a given location, *id.* § 7.96(g)(5), to whether portions of Pennsylvania Avenue may be set aside for portable toilets during presidential inaugurations, *id.* 7.96(g)(4(iii). As it pertains to the use of fire during a demonstration, § 7.96 states that, "[i]n connection with permitted demonstrations" or demonstrations for which a permit is not needed, "temporary structures may be erected for the purpose of symbolizing a message or meeting logistical needs." *Id.* § 7.96(g)(5)(vi). These

demonstration activity set forth at 36 C.F.R. § 7.96(g), including for Lafayette Park, that supplants the general wilderness regulations regarding the subject matter encompassed. Section 7.96 establishes a comprehensive set of regulations tailored to Lafayette Park's "unique nature" as "a primary assembly point for First Amendment activity aimed at influencing national policies." *Doe*, 968 F.2d at 89.

The special regulations governing Lafayette Park permit the use of fire for expressive purposes. These regulations expressly contemplate, reference, and regulate fire within the park areas of the National Capital Region. Specifically, in connection with "permitted demonstrations or special events," the regulations only prohibit "making any fire" with any temporary structure for purposes of camping, i.e., to live at a demonstration site or for "living accommodation activity," except within a designated camping area. 36 C.F.R. § 7.96(g)(5)(vi). The regulations do not otherwise prohibit the use of fire for expressive purposes and, additionally, are clear that a permit is not required for expressive or demonstration activity involving twenty-five (25) persons or less, such as Mr. Carey's. 36 C.F.R. § 7.96(g)(2)(i).[4]

In promulgating these regulations that restricted the use of fire, the Secretary of Interior expressly acknowledged the intent to permit the use of fire for expressive or demonstration

---

structures "may not be used outside designated camping areas living accommodation activities such as," among other things, "making any fire." *Id.* Such activities "constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conduct these activities, are in fact using the areas as a living accommodation." *Id.* Section 7.96 then provides further specificity as to how demonstration activities are to be conducted in Lafayette Park. *See, e.g.*, *id.* § 7.96(g)(5)(ix)(B)(2) (specifying the permissible size of signs that are not hand-carried). But neither the specific National Capital Region park demonstration regulations nor the Lafayette Park particular provisions prohibit fire that is not being used for camping.

[4] "Demonstrations involving 25 persons or fewer may be held without a permit provided that the other conditions required for the issuance of a permit are met and further provided that the group is not merely an extension of another group already availing itself of the 25-person maximum under this provision or will not unreasonably interfere with other demonstration or special events." 36 C.F.R. 36 C.F.R. § 7.96(g)(2)(i).

purposes, referencing with favor an example of "building of fire in an event such as the Christmas Pageant of Peace" on the Ellipse next to the White House, which was not being prohibited. *See* 47 Fed. Reg. 24302, 24303 (June 4, 1982). The Secretary stated, with respect to fire used in connection with demonstrations, it was being prohibited outside of designated campgrounds only where it appeared that, in conducting such activity, the actors were doing so "as a living accommodation." *Id*. This preserved the ability to use fire in connection with demonstration or expressive activities in areas within the scope of 36 C.F.R. § 7.96.

Consequently, the regulations contained in § 2.13, pursuant to which Mr. Carey has been charged, are supplanted by § 7.96, and are inapplicable to use of fire for expressive or demonstration activity within Lafayette Park.

## II.    Argument

### A.  Section 2.13 Does Not Apply to Mr. Carey's Conduct

As a matter of statutory interpretation and law, the regulations that form the basis for Mr. Carey's charges do not apply to his expressive demonstration activity in Lafayette Park. The information therefore fails to state an offense and should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v).

Expressive demonstrations and the use of fire for expressive purposes during demonstrations in Lafayette Park are exclusively governed by the specific, comprehensive scheme set forth in 36 C.F.R. § 7.96. Section 7.96 promulgates special regulations for the National Capital Region, D.C. area, explicitly including Lafayette Park. *See, e.g.*, 36 C.F.R § 7.96(g)(ix). These "special regulations prescribed for specific park areas . . . may amend, modify, [or] relax . . . the regulations contained in parts 1 through 5 . . .  of this chapter," 36 C.F.R. § 1.2(b), such as the fire regulations contained in § 2.13.

The specific and quite comprehensive regulations in Part 7 supplant the general wilderness regulations in Part 2. This reflects "'an old and familiar rule' that 'the specific governs the general.'" *Genus Med. Techs., LLC v. F.D.A.*, 994 F.3d 631, 638 (D.C. Cir. 2021) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012)).

Prior to Mr. Carey's August 25 demonstration, the National Park Service relied on § 7.96, not § 2.13, to regulate the use of fire for expressive purposes. For example, on August 9, 2018, the National Park Service issued a permit for a demonstration in Lafayette Park at which "one double side Nazi/Federate flag" was to be burned.[5] Ex. E, United States Department of the Interior Public Gathering Permit at 2. This permit explicitly states that it was granted "[i]n accordance with Park Regulations as contained in C.F.R., Title 36, Chapter 1, Section 7.96." *Id.* at 1. In other words, flag burning is permitted or countenanced within the Part 7 special regulation and the Part 7 special regulation governs such expressive conduct. The NPS-issued permit makes no mention of § 2.13 or its various requirements. Even the portion of the permit specifically titled "Flag Burning Fire Conditions" refers only to § 7.96. *Id.* at 4-5.

Historic practice in other contexts confirms that the use of fire for expressive purposes is permitted within Lafayette Park. Candlelight vigils occur frequently in Lafayette Park, and permits are issued for vigils involving hundreds or thousands of candle-bearing participants.[6] *See, e.g.*, Rachel Sadon, *Several Vigils Planned Tonight for Charlottesville*, DCist (Aug. 13, 2017, 1:23 PM), https://dcist.com/story/17/08/13/candlelight-vigils-planned-tonight/;  Claire Kirch, *AWP 2017: Politicized Writing Conference Ends With White House Vigil*, Publishers

---

[5] As previously stated, Mr. Carey had no need to obtain a demonstration permit because his demonstration fell below the minimum number of participants. *See* 36 C.F.R. § 7.96(g)(2)(i).

[6] No permit is necessary for "[d]emonstrations involving 25 persons or fewer." 36 C.F.R. § 7.96(g)(2)(i).

Weekly (Feb. 12, 2017), https://www.publishersweekly.com/pw/by-topic/industry-news/trade-shows-events/article/72774-awp-2017-politicized-writing-conference-ends-with-white-house-vigil.html; Rabia Iclal Turan, *Turkish Americans hold candlelight vigil in US capital to mourn victims of earthquakes*, AA (Nov. 2, 2023), https://www.aa.com.tr/en/americas/turkish-americans-hold-candlelight-vigil-in-us-capital-to-mourn-victims-of-earthquakes/2815387. Likewise, fires have historically been permitted at other Capital-area parks governed by § 7.96, including at the Ellipse during the Pageant of Peace. *See* 47 Fed. Reg. 24303 (June 4, 1982) (noting that "[the] building of fires in an event such as the Christmas Pageant of Peace [is] not prohibited").

The text, legislative history, and historic implementation of the operative regulations all lead to the same conclusion: the special regulations in § 7.96, which do not prohibit the use of fire for expressive purposes, rather than the general fire regulations in § 2.13, apply to Mr. Carey's conduct. Mr. Carey is not alleged to have violated the special regulations. As such, Mr. Carey has not violated 18 U.S.C. § 1865(a) or 54 U.S.C. § 100751(c) and the charges against him should be dismissed.

**B.    Any Uncertainty as to Which Regulation Applies Must Be Resolved in Favor of Mr. Carey**

It is Mr. Carey's position that § 2.13 does not apply to his conduct, but to the extent that this Court finds it to be ambiguous or uncertain whether § 7.96 supplants or modifies § 2.13, the rule of lenity and the canon of constitutional avoidance both require that this uncertainty be resolved in Mr. Carey's favor.

"The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States* v. *Santos*, 553 U.S. 507, 514 (2008). "[T]he rule of lenity is venerable." *United States v. Reffitt*, 602 F. Supp. 3d 85, 102 (D.D.C. 2022) (quoting

*United States v. Nasir*, 17 F.4ᵗʰ 459, 472 (3d Cir. 2021) (Bibas, J., concurring)). "It ensures that defendants are on notice of the criminality of their conduct." *Id.* It is, at best, unclear whether and to what extent § 2.13 applies to Lafayette Park. "When interpreting a criminal statute, we do not play the part of a mindreader." *Santos*, 553 U.S. at 515. Where, as here, "'a reasonable doubt persists about a [regulation]'s intended scope even <u>after</u> resort to the language and structure, legislative history, and motivating policies of the statute,' courts must adopt the narrower interpretation." *Sandvig v. Barr*, 451 F. Supp. 3d 73, 88 (D.D.C. 2020) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). For the reasons outlined in Part (I)(a), above, any narrower interpretation exempts the expressive use of fire from the generalized prohibitions contained in § 2.13.

"[T]he canon of constitutional avoidance requires that if one of two linguistically permissible interpretations raises 'serious constitutional problems' and the other does not, [courts] are to choose the second unless it is 'plainly contrary to the intent'" of the drafter. *United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015) (quoting *Solid Waste Agency v. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001)). The special regulations that have been promulgated in § 7.96 have been painstakingly crafted and iterated upon to preserve National Capital Region park-goers' First Amendment rights. They reflect the unique role that National Capital Region parks, and Lafayette Park in particular, play as "a situs where the government not only tolerates but explicitly permits demonstrations and protests because of its unique location across the street from the White House." *Doe*, 968 F.2d at 88. Section 2.12, on the other hand, "deals with uses typical of wilderness areas, such as Yellowstone Park, i.e., campfires (§ 2.13), . . . not . . . urban enclaves such as Lafayette Park." *Id.* at 89. Attempting to apply § 2.13 to Mr. Carey's actions raises serious constitutional questions as to whether the methods used for

preventing forest fires in the wilderness are narrowly tailored as applied to the unique circumstances of Lafayette Park. *See id.* at 90 ("In a First Amendment challenge, the government bears the burden of showing that its restriction on speech is justified under the traditional 'narrowly tailored' test. That test, moreover, must be applied in a realistic manner which takes into account the nature and traditional uses of the particular park involved.").

Interpreting these regulations such that both § 2.13 and § 7.96 apply to expressive conduct in Lafayette Park raises further constitutional issues in the form of the vagueness doctrine. The vagueness doctrine operationalizes the due process requirement that laws give people fair notice of what is prohibited. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a law regulates expression, any lack of fair notice "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). For the reasons explained in Part II(a), above, the provisions of § 2.13 and § 7.96 are inconsistent at best and flatly incompatible at worst. It is not obvious to an individual of average intelligence how to comport their expressive conduct with the requirements of both sections. Should this Court find that it is ambiguous or uncertain whether § 2.13 applies to Mr. Carey's conduct, the foregoing principles require that the uncertainty be resolved in Mr. Carey's favor, and the case against him be dismissed.

## C. The Government is Vindictively Prosecuting Mr. Carey for Exercising His First Amendment Rights

The Government is vindictively prosecuting Mr. Carey for the exercise of his First Amendment rights, in violation of the Due Process Clause of the Fifth Amendment. "'Prosecutorial vindictiveness' is a term of art with a precise and limited meaning. The term refers to a situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights." *United States v. Meyer*, 810 F.2d

1242, 1245 (D.C. Cir. 1987) *reh'g granted and opinion vacated*, 816 F.2d 695 (D.C. Cir. 1987),

*reh'g denied and opinion reinstated*, 824 F.2d 1240 (D.C. Cir. 1987). "Due process clearly

protects criminal defendants against prosecutorial or judicial action intended as a penalty for a

defendant's exercise of constitutional rights."[7] *United States v. Mills*, 925 F.2d 455, 463 (D.C.

Cir. 1991); *see also United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("[W]hile an individual

certainly may be penalized for violating the law, he just as certainly may not be punished for

exercising a protected statutory or constitutional right."); *United States v. Wilson*, 262 F.3d 305,

314 (4th Cir. 2001) (it is "well established that a prosecutor violates the Due Process Clause of

the Fifth Amendment by exacting a price for a defendant's exercise of a clearly established right

or by punishing the defendant for doing what the claw plainly entitles him to do"). "In light of

the importance of this protection, the Supreme Court has articulated a prophylactic rule requiring

prosecutors to defend their charging decisions whenever the facts present a 'realistic likelihood'

that vindictiveness has played some role." *Mills*, 925 F.2d at 463. The "vindictive prosecution

framework is appropriate when a defendant argues that charges were brought in retaliation for

---

[7] Subsequent decisions have framed the issue more narrowly. *See, e.g.*, *Maddox v. Elzie*, 238
F.3d 437, 446 (D.C. Cir. 2001) ("In the prosecutorial context, the doctrine [of vindictiveness]
precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally
protected right available to a defendant *during a criminal prosecution*." (emphasis added)). But
the formulation in *Meyer* and *Mills* continues to be good law and comports with the approach to
vindictive prosecution claims used in other jurisdictions. *See, e.g.*, *United States v. Sanders*, 211
F.3d 711, 716 (2d Cir. 2000) (assuming that vindictiveness doctrine applied to prosecution
allegedly brought to punish journalists); *United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir.
1989) (vindictiveness doctrine applied to prosecution brought to punish filing of sex
discrimination lawsuit). Dismissing this prosecution for vindictiveness would also be an
appropriate remedy in keeping with federal courts' related—but substantially more intrusive—
authority to "issue injunctions preventing bad faith prosecutions which are brought to discourage
First Amendment activities." *PHE, Inc. v. United States Dep't of Justice*, 743 F. Supp. 15, 22-23
(D.D.C. 1990).

exercising constitutional rights." *United States v. Gonzalez*, 507 F. Supp. 3d 137, 175 n.31 (D.D.C. 2020).

"A defendant may prove prosecutorial vindictiveness by submitting either (i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient to establish a 'realistic likelihood of vindictiveness,' thereby raising a presumption the Government must rebut with objective evidence justifying its action." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (quoting *Meyer*, 810 F.2d at 1245). A defendant may prove actual vindictiveness by showing that the prosecutor "was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'" *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (quoting *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999)); *see also United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989) (defendant showed "'evidence' of vindictive prosecution" on the theory that the EEOC "prevail[ed] upon the Department of Justice to institute a prosecution that would not have been undertaken but for [the defendant's] exercise of her statutory right to sue").

The language of the operative executive order and President Trump's subsequent statements regarding flag burning provide objective evidence that the prosecutor in this case is merely a stalking horse for President Trump's animus toward those who exercise their First Amendment right to burn the American flag. It is black letter law that burning an American flag as Mr. Carey did is "expressive conduct" protected by the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989) ("The expressive, overtly political nature of this conduct was both intentional and overwhelmingly apparent."). Executive Order 14,341, Prosecuting Burning of the American Flag, pursuant to which Mr. Carey was arrested and prosecuted, makes no secret of the fact that it is instructing Executive Branch officials to make an end-run around those First

Amendment protections in order to prosecute speech that the President personally finds distasteful. The executive order explicitly instructs Executive officials to "vigorously prosecute those who violate our laws in ways that involve desecrating the American Flag." Exec. Order No. 14,341 90 Fed. Reg 42,127. The accompanying signing statement is likewise explicit that the purpose of the order is to "prosecute those who desecrate this symbol of our freedom, identity, and strength to the fullest extent permissible." Objective evidence also establishes that the officers and charging AUSA acted in order to operationalize this executive order, flatly stating that they were arresting and charging Mr. Carey because "the President just today signed an executive order that says we're arresting him."

Public statements made by the President in the time since Mr. Carey was arrested and charged provide further evidence of prosecutorial vindictiveness. In an October 3, 2025, Truth Social post, President Trump reiterated that prosecutions like this were nothing more than punishment for speech the President personally disliked. He instructed "ICE, Border Patrol, Law Enforcement, and all U.S. Military" that "per [the] August 25, 2025 Executive Order . . . anybody burning the American Flag will be subject to one year in prison. You will be immediately arrested." Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 3, 2025, 7:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115312821068691123. The President's blanket threat to punish flag burning with one year of imprisonment is completely divorced from any of the statutes his executive order purports to be enforcing and reveals the order's true purpose: punishing the exercise of First Amendment rights.

At a White House event on October 8, 2025, the President confirmed that the point of the executive order was to circumvent the First Amendment as it relates to flag burning. He stated that "[w]e took the freedom of speech away, because that's been through the courts, and the

courts said you have freedom of speech but what has happened is when they burn the flag it agitates and irritates crowds." BrieAnna J. Frank, *Trump says he 'took the freedom of speech away' on flag burning*, USA Today (Oct. 8, 2025, 9:32 PM), https://perma.cc/TW8H-E32Q. Influencer Nick Sortor, who was attending the event, then presented a flag that he claimed to have taken from a man who was "burning it in the street." The President inquired whether Sortor "kn[e]w who he [wa]s." When Sortor stated that he did, the President responded "[s]o why don't you give it to Pam [Bondi]. Give it to the Attorney General and we'll start prosecutions." Aaron Rupar (@atrupar.com), Bluesky (October 8, 2025, 3:57 PM), https://bsky.app/profile/atrupar.com/post/3m2pgggygdg2s. Here again, the President's statement that his administration would "start prosecutions" had no basis in the law or facts relevant to the flag burning Sortor purportedly stopped. The President knew nothing about either. His unhesitating enthusiasm for initiating prosecution is further evidence of the animus underlying Executive Order 14,341 and any law enforcement action taken pursuant to it.

        This is the rare case in which a defendant can prove that a prosecution was initiated with "actual vindictiveness." As such, this prosecution of Mr. Carey violates the Due Process Clause of the Fifth Amendment and the Free Speech Clause of the First Amendment and should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A)(iv).

   **D.  At a Minimum Discovery and an Evidentiary Hearing are Required**

        At the very least, if the Court concludes that that Mr. Carey has not established that he is being vindictively prosecuted, then the Court should order discovery in the government's motives and a hearing.

        The U.S. District Court for the District of Columbia followed other Circuit precedent when it adopted as the standard for ordering discovery on a claim of vindictive prosecution the

same standard articulated in *Armstrong* for selective prosecution claims. *Gonzalez*, 507 F. Supp. 3d at 175. That test requires that the defendant provide "some evidence tending to show the existence of a discriminatory purpose and a discriminatory effect." *Id.* (quoting *Armstrong*, 517 U.S. at 469).

The objective evidence presented above, straight from the mouths of the President and law enforcement apparatus, not only tends to show, but in fact *announces* the existence of a discriminatory purpose and effect. The stated goal of the EO is for prosecutors to use laws unrelated to protected speech to punish people for engaging in protected speech. The Government selected § 2.13 and ignored the governing § 7.96 for the discriminatory purpose of punishing Mr. Carey for engaging in constitutionally protected speech disfavored by the President.

On October 7, 2025, counsel for Mr. Carey requested in discovery "Communications on August 25, 2025 between a) White House Staff, the Department of Justice, or U.S. Attorney's Office for the District of Columbia and b) the agents of the U.S. Park Police, U.S. Secret Service, or any other law enforcement agency involved with Mr. Carey's arrest, detention, and charging of Mr. Carey." Ex. F, Letter from Nick Place to Travis Wolf at 2 (Oct. 7, 2025). Defense counsel has received no discovery responsive to this request. In addition to materials responsive to that request, Mr. Carey respectfully asks this Court to order the production of documents or communications from or to any Government entity related to the arrest, charging, and prosecution of Mr. Carey. Mr. Carey also asks this Court to order the Government to identify and make available for testimony at an evidentiary hearing the Assistant U.S. Attorney on the phone with U.S. Park Police on August 25 while Mr. Carey was being detained in Lafayette Park.

**III.    Conclusion**

This Court should dismiss the charges against Mr. Carey because the Government has failed to state an offense because the governing Part 7 special regulation does not prohibit the conduct alleged. Alternately, the rule of lenity or constitutional avoidance operate to warrant dismissal.

The charges should, independently, be dismissed because this constitutes a vindicative prosecution, the vindictiveness and discriminatory targeting of Mr. Carey's speech is objectively manifest in the executive order and related statements. In the alternative, this Court should order an evidentiary hearing on Mr. Carey's vindictive prosecution claim. *See United States v. Michel*, No. 19-CR-148-1, 2022 U.S. Dist. LEXIS 165191, at *25 (D.D.C. Sept. 13, 2022) (ordering an evidentiary hearing on vindictive prosecution claim).

Respectfully Submitted,

*/s/ Nick Place*
Nick Place Bar #LA0021
nick.place@justiceonline.org
Partnership for Civil Justice Fund
617 Florida Ave NW
Washington, DC 20001
(202) 220-8750

*/s/ Mara Verheyden-Hilliard*
Mara Verheyden-Hilliard (Bar # 450031)
mvh@justiceonline.org
Partnership for Civil Justice Fund
617 Florida Ave NW
Washington, DC 20001
(202) 919-4440

*Counsel for Defendant*

18