**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JAN CAREY,**<br><br>    **Defendant.** | **Criminal Action No. 25-251 (JEB)** |

<u>**MEMORANDUM OPINION**</u>

You cannot falsely shout fire in a crowded theater. What about lighting a fire in a crowded park? After President Donald Trump issued an executive order directing the Department of Justice to prosecute anyone who engages in the protected speech of burning the American flag, Defendant Jan Carey marched to Lafayette Park and burned a flag in protest. He stands charged with violating park regulations that prohibit setting a fire outside a designated area or receptacle and lighting a fire that damages property or threatens public safety. He now moves to dismiss these misdemeanors, arguing that the regulations do not apply to his conduct and that the Government is vindictively prosecuting him. The Court holds that the regulations do indeed apply to Carey's flag burning, but it finds that he is entitled to proceed with a further inquiry into whether he is being prosecuted to punish him for his allegedly illegal actions or for his constitutionally protected speech. It will therefore deny his Motion in part.

I.    **Background**

The First Amendment protects burning the American flag. <u>Texas v. Johnson</u>, 491 U.S. 397, 399 (1989). Yet last August, President Trump issued an executive order decrying flag burning and announcing, "My Administration will . . . prosecute those who . . . otherwise violate

our laws while desecrating this symbol of our country, to the fullest extent permissible under any available authority."  Prosecuting Burning of the American Flag, Exec. Order No. 14341, 90 Fed. Reg. 42127, 42127 (Aug. 28, 2025).  The order noted that flag burning might violate several "content-neutral laws" that fight "harm unrelated to expression, . . . such as open burning restrictions . . . or destruction of property laws."  Id.

Outraged, Carey grabbed an American flag and headed to Lafayette Park, which sits right across from the White House.  See ECF No. 12 (MTD) at 4.  He laid the flag down on a brick path and, clutching a lighter in one hand and a megaphone in the other, declared that he had served in the Army for twenty years and "fought for every single one of your rights to express yourself . . . . There's a First Amendment right to burn the American flag.  The [President] signed an executive order today saying that it was illegal to burn the American flag."  Exh. A (YouTube Video) at 0:12–35.  Gesturing at the White House, Carey announced, "I'm burning this flag as a protest to that illegal fascist President that sits in that house."  Id. at 0:42–50.  He then bent down and lit the flag on fire.  Id. at 0:50–56.  Officers on the scene eventually extinguished the burning flag, id. at 1:10–17, leaving its charred remains and some scorched bricks underneath.  Id. at 1:16–20; ECF No. 12-2 (Incident Report) at ECF p. 3.

As these events were unfolding, U.S. Park Police Officers Francisco Pacheco and Enrique Wong were heading to the scene.  The Park Police's subsequent incident report would list Pacheco as an assisting officer and Wong as the supervisor.  See Incident Report at ECF pp. 2, 4.  When Pacheco arrived, Carey had already burned the flag, and officers on the scene were discussing what to do next.  One told Pacheco, "The only thing is that executive order went out today for flag burning.  I don't know if you know that, but he signed the executive order today."  Exh. B (Pacheco Bodycam Video) at 1:52–2:00.  The officers discussed possible charges,

including violating regulations governing fires on Park Service property.  Id. at 2:00–31.  A third officer chimed in that some candidate charges were "listed in the executive order," id., pulled up the order on his phone, and handed it to Pacheco.  Id. at 3:45–55.

Nearby, Officer Wong was stepping out of his cruiser.  His bodycam video shows him reading something on his phone, although the Court cannot tell whether it was the executive order or something else.  See Exh. C (Wong Bodycam Video) at 0:31–39.  As he walked to join his fellow officers, he commented, "So the President just today signed an executive order [that] says we're arresting him.  We got that going for us.  It says the executive order's signed."  Id. at 0:45–1:00.  Officers then radioed someone, who recommended what to charge Carey with and said, "I will advise the AUSAs here."  Pacheco Bodycam Video at 4:54–5:28.  Pacheco then told a fellow officer, "Command staff just, looks like they're having us handle it this way.  . . . They got the AUSA with them."  Id. at 7:49–55.  "What we were thinking this morning is Trump signed an executive order for the flag stuff," the officer responded, "so I don't know if they're gonna try to charge that federally or not."  Id. at 7:58–8:05.  "That's why I'm getting confirmation through the supervisors," replied Pacheco, "and we're gonna do it through them."  Id. at 8:06–09.  At some point during these interactions, officers arrested Carey.

He was charged with the misdemeanors of (1) "[l]ighting or maintaining a fire" that was not "in designated areas or receptacles and under conditions that may be established by the superintendent," 36 C.F.R. § 2.13(a)(1), and (2) "[l]ighting, tending, or using a fire . . . in a manner that threatens, causes damage to, or results in the burning of property . . . or park resources, or creates a public safety hazard."  Id., § 2.13(a)(3); see also 18 U.S.C. § 1865(a) (violations of those regulations are misdemeanors); ECF No. 14 (Second Am. Information) at 1–

2 (charging Carey with these violations).  He now moves to dismiss.  <u>See</u> Fed. R. Crim. P.

12(b)(3)(A)(iv), (B)(v).

## II.    Legal Standard

Prior to trial, a defendant may move to dismiss an information (or specific counts) on the

basis that there is a "defect in the . . . information," including a "failure to state an offense."  Fed.

R. Crim. P. 12(b)(3)(B)(v).  "The operative question is whether the allegations, if proven, would

be sufficient to permit" the factfinder to conclude that the defendant committed the criminal

offense as charged.  <u>See</u> <u>United States v. Sanford, Ltd.</u>, 859 F. Supp. 2d 102, 107 (D.D.C. 2012);

<u>United States v. Bowdoin</u>, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  An information "is

sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant

of the charge against which he must defend, and, second, enables him to plead an acquittal or

conviction in bar of future prosecutions for the same offense."  <u>Hamling v. United States</u>, 418

U.S. 87, 117 (1974).

A defendant may also move to dismiss on the basis of an affirmative defense, including

vindictive prosecution.  <u>See</u> Fed. R. Crim. P. 12(b)(3)(A)(iv).

## III.    Analysis

Carey moves to dismiss on two grounds.  First, he contends that the regulations he is

charged with violating — which generally govern fires on all lands managed by the National

Park Service — are superseded by regulations that govern D.C. parks specifically.  Those more

specific regulations, Carey argues, do not prohibit his alleged conduct.  Second, Defendant

claims that he is being vindictively prosecuted.  The Court takes those arguments in turn.

A.    <u>Regulations</u>

A federal statute makes it a crime to "violate[] any regulation" that the Secretary of the Interior issues to manage federal land.  <u>See</u> 18 U.S.C. § 1865(a); 54 U.S.C. §§ 100102(1), 100102(6), 100501, 100751(a).  That includes regulations for "federally owned lands and waters administered by the National Park Service," 36 C.F.R. § 1.2(a)(1), including Lafayette Park. Those regulations are split into two types.

First, there are general regulations, which apply to all land that the Park Service manages, from the Jefferson Memorial to Denali.  <u>See</u> General Regulations for Areas Administered by the National Park Service, 48 Fed. Reg. 30252, 30252 (June 30, 1983).  These universal rules prohibit actions like feeding wildlife, <u>see</u> 36 C.F.R. § 2.2(a)(2), littering, <u>id.</u>, § 2.14(a)(1), and letting your pet off leash.  <u>Id.</u>, § 2.15(a)(2).

Second, the Secretary issues specific rules for individual parks.  <u>Id.</u>, § 1.2(c).  For instance, one says that if you travel to Yellowstone and are walking from one thermal hot spring to the next, you must stay on the "boardwalks or trails that are maintained for such travel and are marked by official signs."  <u>Id.</u>, § 7.13(j).  Another dictates that if you are scuba diving in the Virgin Islands Coral Reef National Monument, you cannot scoop up a conch and take it home with you.  <u>Id.</u>, § 7.46(a)(1).  A third says that if you are gazing into the Lincoln Memorial Reflecting Pool, you cannot jump in and go for a swim.  <u>Id.</u>, § 7.96(e).  These park-specific regulations "may amend, modify, relax or make more stringent" the universal rules.  <u>Id.</u>, § 1.2(c).

Carey is charged with violating two universal regulations governing fires, which are found in Section 2.13 of Title 36 of the Code of Federal Regulations.  One bars "lighting or maintaining a fire, except in designated areas or receptacles and under conditions that may be established by the superintendent."  <u>Id.</u>, § 2.13(a)(1).  The other forbids "[l]ighting, tending, or

using a fire . . . in a manner that threatens, causes damage to, or results in the burning of property . . . or park resources, or creates a public safety hazard." Id., § 2.13(a)(3).

Carey argues that these universal fire rules are superseded by Section 7.96 of that same title, which contains the specific rules for parks in the National Capital Region, including Lafayette Park. He points out that Section 7.96 contains pages of intricate rules about demonstrations. Id., § 7.96(g). When it comes to demonstrations involving fires, however, it bars them in only one circumstance: using "[t]emporary structures" that are not in "designated camping areas" for "living accommodation activities such as . . . making any fire." Id., § 7.96(g)(5)(vi). Carey had no temporary structure, so he insists that he did not violate the only regulation that applies. See MTD at 7.

The Court disagrees, holding instead that the park-specific demonstration rules in Section 7.96 do not displace the universal fire rules in Section 2.13. Far from conflicting with Section 2.13, Section 7.96 is best read in harmony with it. Section 2.13 bars uncontained and dangerous fires on all Park Service land, including in D.C. Section 7.96 makes that background rule "more stringent," 36 C.F.R. § 1.2(c), by forbidding other fires, too: ones that involve using a "[t]emporary structure[] . . . for living accommodation activities." Id., § 7.96(g)(5)(vi). Section 7.96(g) thus adds to Section 2.13 based on the particular needs of D.C. parks. It does not erase Section 2.13's background rules.

Because the rules do not conflict, Carey must argue that Section 7.96 occupies the field of demonstrations in D.C. parks, impliedly displacing all other rules that would otherwise apply to demonstrators — including the universal rules about fires. See MTD at 6–7. He thus posits that this limited restriction represents the Secretary's careful and comprehensive balance between fire safety and free speech in the nation's capital. Id. at 7.

That seems unlikely, since the rule Defendant points to is not even focused on demonstrators' fires. In full, it says that people may erect "temporary structures . . . for the purpose of symbolizing a message" — think of putting up a shanty town to protest apartheid — or for "meeting logistical needs such as first aid facilities." 36 C.F.R. § 7.96(g)(5)(vi). The regulation then explains that such "[t]emporary structures may not be used outside designated camping areas for living accommodation activities such as sleeping, . . . or making any fire, or doing any digging or earth breaking or carrying on cooking activities." Id. "The above-listed activities constitute camping," id. — which is prohibited outside designated areas, id., § 7.96(i)(1) — "when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation . . . ." Id., § 7.96(g)(5)(vi). The regulation is thus focused on demonstrations that involve camping, not ones that involve fires. It addresses demonstrators' fires only incidentally, insofar as they might signal camping. In fact, cases universally refer to this rule as an "anti-camping regulation." United States v. Thomas, 864 F.2d 188, 192–94, 196 (D.C. Cir. 1988); accord Clark v. Cmty. for Creative Non-violence, 468 U.S. 288, 290–91, 294 (1984); United States v. Musser, 873 F.2d 1513, 1518–19 (D.C. Cir. 1989). The Court doubts that the rule represents the Secretary's comprehensive and exhaustive solution to the problem of demonstrators' fires when it was not even crafted to address that issue.

Plus, Carey's reading presumes that any act forbidden by the universal rules must be allowed in Lafayette Park as long as it is part of a demonstration, unless Section 7.96(g) explicitly says otherwise. That would allow littering, see 36 C.F.R. § 2.14(a)(1), intentionally disturbing wildlife, id., § 2.2(a)(2), or introducing an invasive species. Id., § 2.1(a)(2). Turning to Carey's activity, his reading would authorize setting an enormous, uncontained, and

dangerous blaze right across from the White House.  When Defendant's interpretation "would compel" such "an odd result," and when an alternative reading is both plausible and would make far more sense, that is further evidence that he is misreading the regulations.  Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440, 454 (1989) (internal quotation marks omitted).

Defendant responds with six arguments, none of which persuades.  First, he points to the canon that specific rules override general ones.  See MTD at 8.  But that heuristic "is not an absolute rule."  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 646 (2012). It applies most naturally where the specific provision conflicts with the general one or would make the general one superfluous.  Id. at 645.  Neither is true here.  As canvassed above, Sections 2.13 and 7.96 epitomize the familiar case where a specific rule does not abrogate a general one but extends it by adding further restrictions.  Because the universal and park-specific rules "are complementary," there is no "difficulty in fully enforcing each . . . according to its terms."  POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 118 (2014).

Second, Carey argues that the Park Service has a practice of allowing expressive fires in Lafayette Park and that the Service's actions suggest that it thinks Section 2.13 does not apply. See MTD at 9.  He cites two pieces of evidence: the Park Service issued a permit in 2018 letting someone burn a Nazi/Confederate flag in Lafayette Park, which permit referred only to the park-specific rules in Section 7.96, id.; ECF No. 12-3 (Public Gathering Permit 18-1484); and demonstrators sometimes use the park to hold candlelight vigils.  See MTD at 9–10.  One-off enforcement decisions by lower-ranking officials cannot control this Court's view of the best reading of the regulations.  Kisor v. Wilkie, 588 U.S. 558, 577 (2019).  It deems such best reading to be that Section 2.13 applies to Carey's actions, and prior administrative misreadings or laxity would not change that.

Third, Defendant digs up a decades-old offhand remark from a response to a comment on a proposed rule. The source notes that the Christmas Pageant of Peace on the Ellipse has sometimes involved the "building of fires." MTD at 10 (quoting National Capital Parks Regulations; Camping, 47 Fed. Reg. 24302, 24303 (June 4, 1982)). Carey concludes that this allusion shows that "fires have historically been permitted at . . . Capital-area parks governed by § 7.96." Id. Nobody is arguing that Section 2.13 bans fires entirely. Instead, it requires only that fires be in designated areas or receptacles and not damage property or threaten public safety. See 36 C.F.R. § 2.13(a)(1), (3). The fire at the Christmas Pageant of Peace presumably met those requirements and so is compatible with Section 2.13's application.

Fourth, Carey maintains that because he finds it unclear whether Section 2.13 or Section 7.96 governed his conduct, the regulatory scheme is unconstitutionally vague. See MTD at 12. A law is impermissibly vague if it does not give fair notice of what it prohibits. Grayned v. City of Rockford, 408 U.S. 104, 108–10 (1972). Here, the regulatory scheme gives plenty of notice that the universal rules apply in Lafayette Park: it warns that those rules "apply to all persons entering, using, visiting, or otherwise within . . . federally owned lands . . . administered by the National Park Service." See 36 C.F.R. § 1.2. While confirming that those rules remain in effect in Lafayette Park might require some textual interpretation, the mere existence of an interpretive question does not render a scheme unconstitutionally vague. United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017); Rose v. Locke, 423 U.S. 48, 49–50 (1975).

Fifth, Defendant contends that it is ambiguous whether Section 2.13 or Section 7.96 applies to his flag burning, so the canon of constitutional avoidance counsels against holding that Section 2.13 governs. See MTD at 11–12. Constitutional avoidance, however, comes into play only when an interpretation "would raise serious constitutional problems." Edward J. DeBartolo

Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1989).  Yet the Court does not foresee serious issues with applying content-neutral burning restrictions to people who set uncontained or dangerous fires that have some expressive component.  See City of Columbus v. Meyer, 786 N.E.2d 521, 523–24, 529 (Ohio Ct. App. 2003) (holding that content-neutral open-burning restriction "easily satisfied" First Amendment as applied to flag burner).  So this canon does not help Defendant either.

Finally, Carey urges the Court to side with him under the rule of lenity.  See MTD at 10–11.  But lenity applies only when a court has exhausted all interpretive tools and the statute or regulation remains incorrigibly ambiguous.  Ocasio v. United States, 578 U.S. 282, 295 n.8 (2016); Shaw v. United States, 580 U.S. 63, 71 (2016); Abramski v. United States, 573 U.S. 169, 188 n.10 (2014).  Here, the Court finds it straightforward that Section 2.13 applies, so there is no insoluble ambiguity that would force it to resort to lenity.  Bondi v. VanDerStok, 604 U.S. 458, 484 (2025) ("[N]either lenity nor avoidance has any role to play where 'text, context, and structure' decide the case.") (quoting Van Buren v. United States, 593 U.S. 374, 393–94 (2021)).

The Court therefore holds that Section 2.13 applies to Carey's conduct and so denies his Motion to Dismiss for failure to state an offense.

B.      Vindictive Prosecution

Even if Carey's alleged conduct would violate the law, he asserts that he is being prosecuted because of his constitutionally protected speech.  He therefore moves to dismiss the charges for vindictive prosecution.  See MTD at 1; Fed. R. Crim. P. 12(b)(3)(A)(iv).  His Motion raises two questions.  First, does vindictive prosecution include retaliation for pre-prosecution speech?  Second, if so, has Carey made out a plausible claim?  The Court addresses those questions in turn.

1.    *Pre-Prosecution Speech*

The doctrine of vindictive prosecution embodies a basic principle: while the Government can prosecute someone because he broke the law, it cannot prosecute him in retaliation for exercising his rights.  United States v. Meyer, 810 F.2d 1242, 1245 (D.C. Cir. 1987); United States v. Goodwin, 457 U.S. 368, 372 (1982).  If a prosecution is vindictive, then courts can dismiss the resulting indictment.  Bragan v. Poindexter, 249 F.3d 476, 482 (6th Cir. 2001).

Vindictive prosecution typically involves retaliating against a defendant for exercising a procedural right during his prosecution — for instance, if a defendant is convicted and successfully appeals, and on remand the prosecutor punishes him by tacking on more charges. E.g., United States v. Ball, 18 F.4th 445, 455 (4th Cir. 2021).  Carey's claim is different.  He argues that he was prosecuted not for exercising his rights as a criminal defendant, but for exercising his right to free speech before he was charged.  Can that kind of alleged retaliation give rise to a defense of vindictive prosecution?

The Court thinks so.  The doctrine of vindictive prosecution has two bases, both of which extend to claims like Carey's.

First, it bars prosecutors from making decisions for illegitimate reasons.  As the Supreme Court has explained, "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional."  Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (internal citation omitted).  "For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right."  Goodwin, 457 U.S. at 372.  This rationale does not depend on whether the defendant is guilty; instead, it holds

that when prosecutors have discretion over charging, they must exercise that discretion legitimately, not as a weapon to punish someone for exercising rights that the Constitution protects.  Charges must be "a legitimate response to perceived criminal conduct," not "an impermissible response to noncriminal, protected activity."  Id. at 373.

Second, the doctrine prevents the Government from using prosecutions to deter people from exercising their rights.  Maddox v. Elzie, 238 F.3d 437, 446 (D.C. Cir. 2001) ("[T]he fear of prosecutorial vindictiveness may unconstitutionally deter a defendant's exercise of a constitutional or statutory right . . . .") (cleaned up).

Neither rationale is limited to rights that a defendant exercises in the course of a prosecution.  Relevant here, both apply when someone is prosecuted for engaging in protected speech.  Such a defendant is prosecuted "because he has done what the law plainly allows him to do," Bordenkircher, 434 U.S. at 363, and is "punished for exercising a protected . . . constitutional right," Goodwin, 457 U.S. at 372, thus making the prosecution "an impermissible response to noncriminal, protected activity."  Id. at 373.  Those prosecutions also deter people from exercising their rights.  Indeed, since the law is especially concerned with chilling effects when it comes to free speech, this basis for the doctrine fits cases like Defendant's especially well.  See Dombrowski v. Pfister, 380 U.S. 479, 486–87 (1965); NAACP v. Button, 371 U.S. 415, 433 (1963); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66 (1963); Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 433 U.S. 1199, 1220 (9th Cir. 2006) (en banc) ("[W]e are particularly sensitive to the harm that may result from chilling effects on protected speech or expressive conduct."); see also Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024) (government cannot "convey a threat of adverse government action in order to punish or suppress . . . speech").

While the D.C. Circuit has not decided whether vindictive prosecution extends to this class of cases, other circuits have suggested that it does. The Sixth Circuit, for example, has held that retaliating for rights exercised outside a prosecution is vindictive. In United States v. Adams, 870 F.2d 1140 (6th Cir. 1989), the defendant worked at the Equal Employment Opportunity Commission and filed an employment-discrimination suit against the agency. Id. at 1142. When the Government then charged her with criminal tax violations, she moved to dismiss, arguing that the EEOC's lawyer had vengefully goaded the Department of Justice into prosecuting her in retaliation for her prior lawsuit. Id. at 1143–44. The Sixth Circuit held that this apparent punishment for exercising the statutory right to sue made out a *prima facie* case of vindictive prosecution and ordered the district court to let the defendant seek discovery. Id. at 1146.

Faced with prosecutorial decisions that allegedly retaliated for free speech, the Second and First Circuits did not question whether that could create a defense of vindictive prosecution. In United States v. Sanders, 211 F.3d 711 (2d Cir. 2000), a reporter wrote an article revealing that he had taken a sample from the wreckage of an airplane crash and claiming that testing on the sample undercut the Government's explanation of why the plane had gone down. Id. at 715. When the Government prosecuted him for "the unauthorized removal . . . of 'a part of a civil aircraft involved in an accident,'" the reporter moved to dismiss for vindictive prosecution — arguing that the Government was punishing him for "challenging [its] official explanation of the disaster." Id. at 716 (quoting 49 U.S.C. § 1155(b)). The Second Circuit held that his allegations failed on the merits, but it presumed that they could support a claim of vindictive prosecution. Id. at 717–19.

Similarly, in United States v. Bucci, 582 F.3d 108 (1st Cir. 2009), the defendant was indicted for selling drugs. Id. at 112. He then "started a website, whosarat.com, where individuals could post information about government informants." Id. The Government later filed a superseding indictment jacking up the charged drug weight tenfold. Id. The defendant moved to dismiss, arguing that he was being punished for his speech — which took place while the prosecution was ongoing but was collateral to it. Id. Like the Second Circuit, the First held that prosecutors were not retaliating against this defendant's speech. Id. at 114–15. But also like the Second, it did not question whether such retaliation would be vindictive if the defendant had shown it occurred. Id.

True, some cases define vindictive prosecution as retaliation against a defendant who exercised a procedural right during his prosecution. Maddox, 238 F.3d at 446 (vindictive prosecution "precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution"); id. ("[T]he evil that a presumption of vindictiveness seeks to eradicate is the threat of retaliation when an accused exercises a right in the course of the prosecution.") (quoting United States v. Esposito, 968 F.2d 300, 303 (3rd Cir.1992)); United States v. Meadows, 867 F.3d 1305, 1314 (D.C. Cir. 2017) (vindictiveness is often about "the prosecutor's decision to 'up the ante' by adding an additional charge" after defendant exercises right). But those framings do not bother the Court for two reasons.

First, other cases define vindictiveness as prosecutors' punishment of defendants for exercising their rights in general — which would include pre-prosecution speech. Meyer, 810 F.2d at 1245 ("'Prosecutorial vindictiveness' is a term of art . . . [that] refers to a situation in which the government acts against a defendant in response to the defendant's prior exercise of

constitutional or statutory rights."); <u>Bordenkircher</u>, 434 U.S. at 363; <u>Goodwin</u>, 457 U.S. at 372–73.

Second, and more important, the cases just mentioned all dealt with defendants who had invoked procedural rights while being prosecuted.  <u>See</u> <u>Maddox</u>, 238 F.3d at 440 (defendant had exercised rights to appeal and to jury trial); <u>Meadows</u>, 867 F.3d at 1312 (defendant had refused to cooperate in investigations into others and rejected plea offers); <u>United States v. Safavian</u>, 649 F.3d 688, 693 (D.C. Cir. 2011) (defendant had appealed).  They were therefore not considering, and certainly not deciding, the different question facing this Court today.  "[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." <u>Turkiye Halk Bankasi A.S. v. United States</u>, 598 U.S. 264, 278 (2023) (quotation marks omitted); <u>see also</u> <u>Bartlett v. Baasiri</u>, 81 F.4th 28, 35 (2d Cir. 2023) (noting that "[o]pinions are not statutes" and so declining to rigidly apply wording of precedent that "did not consider" facts like case before court); <u>Johnson v. Superintendent, Mahanoy SCI</u>, 144 F.4th 178, 185 (3d Cir. 2025) (declining to apply precedent's apparently "categorical" rule to facts that precedent "did not consider, and had no occasion to consider").  The Court will not draw the universal bounds of vindictive prosecution by fixating on arbitrary wording in rule statements pulled from opinions with different facts in mind.  Instead, the sounder course is to examine the doctrine's substance and ask whether it guards against the kind of abuse that Carey alleges here.

2.    *Whether This Prosecution Is Vindictive*

Having held that the defense of vindictive prosecution is available to Carey in principle, the Court now decides whether he has made it out.

a.    Law

A defendant can show vindictiveness in two ways.  United States v. Slatten, 865 F.3d 767, 799 (D.C. Cir. 2017).  First, he can prove that his prosecution was actually vindictive — that is, that the "charging decision was motived by a desire to punish him for" exercising his rights.  Goodwin, 457 U.S. at 384; see also Slatten, 865 F.3d at 799.  "This showing is, of course, exceedingly difficult to make."  Meyer, 810 F.2d at 1245; see also United States v. Jarrett, 447 F.3d 520, 526 (7th Cir. 2006) ("[A] claim of vindictive prosecution is extremely difficult to prove."); Bragan, 249 F.3d at 483 (burden required to show actual vindictiveness is "onerous").

Alternatively, a defendant can point to circumstantial evidence that suggests that the Government acted vindictively — say, if he successfully challenged his conviction on appeal, then the prosecutor threw new charges at him that had been available the whole time.  Such a defendant has no direct evidence of the Government's vindictive motive.  But if he shows that his case fits a general fact pattern in which there is a "realistic likelihood" of vindictiveness, then he creates a presumption that his prosecution was vindictive.  Slatten, 865 F.3d at 799 (quotation marks omitted).  The burden then shifts to the Government to rebut that presumption using "objective information in the record" that justifies its action.  Maddox, 238 F.3d at 446 (quoting Goodwin, 457 U.S. at 374).  That burden is "minimal — any objective evidence justifying the prosecutor's actions will suffice."  Safavian, 649 F.3d at 694.  If the Government meets it, then the burden shifts back to the defendant to show that the Government's explanation is pretextual.  Meyer, 810 F.2d at 1245.

Before jumping into Carey's arguments, the Court must tarry to resolve one more legal question: whether he tries to show actual vindictiveness or to create a presumption, what standard of causation must Defendant meet?  A footnote in the Supreme Court's opinion in

Goodwin suggests that defendants claiming vindictive prosecution must show that the challenged action "result[ed] solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." 457 U.S. at 380 n.11. Taken literally, however, sole causation would make little sense. After all, people who are vindictively prosecuted have often committed the relevant offense. See, e.g., Blackledge v. Perry, 417 U.S. 21, 23, 27–29 (1974) (defendant pled guilty to charge, yet Supreme Court held it was likely brought vindictively). When a prosecutor is motivated by retaliation but the defendant also did it, then it is hard to say that vindictiveness is the sole reason for the charge. Indeed, any time a defendant was indicted, the prosecutor had at least probable cause to bring the vindictive charge — so it is hard to see how the defendant could ever show that exercising his rights was the sole reason he was charged. Yet indicted defendants do win motions to dismiss for vindictiveness. E.g., United States v. LaDeau, 734 F.3d 561, 564 (6th Cir. 2013).

Perhaps seeing that rigidly applying the Supreme Court's dictum does not fit the doctrine, other circuits have settled into a consensus that to show retaliatory prosecution, a defendant must show that prosecutors would not have taken the challenged action but for his exercise of his rights. United States v. Koh, 199 F.3d 632, 640 (2d Cir. 1999); United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001); Adams, 870 F.2d at 1145; United States v. Monsoor, 77 F.3d 1031, 1034 (7th Cir. 1996); United States v. P.H.E., Inc., 965 F.2d 848, 860 (10th Cir. 1992). While the D.C. Circuit has not yet weighed in, this Court agrees with its sister courts throughout the country and holds that Defendant must show that he would not have been prosecuted but for exercising his right to free speech.

b.    Application

With the legal framework set, the Court can finally apply it to the facts of this case.  It first considers whether Carey has shown that his prosecution is actually vindictive, then turns to whether he has established a presumption and whether the Government has rebutted it.

The Court finds plausible the position that Carey's prosecution is actually vindictive, but it cannot yet definitively decide the question.  Consider both sides of the scale.  On one, the President directed the Department of Justice to target anyone who engaged in a particular form of protected speech and to bring any charges it could against him.  When deciding what to do with Carey, officers discussed this order and implied that it was relevant to their choice.  Wong, the supervising officer, mused that "the President just today signed an executive order [that] says we're arresting him."  Wong Bodycam Video at 0:45–55.  Other officers on the scene commented that "[t]he only thing is that executive order went out today for flag burning," Pacheco Bodycam Video at 1:53–56, and surmised that prosecutors might base their charging decision on the order: "Trump signed an executive order for the flag stuff, so I don't know if they're gonna try to charge that federally or not."  Id. at 8:00–05.

While the current record contains little direct evidence of prosecutors' thinking, the executive order directed the Department of Justice to "prosecute those who . . . otherwise violate our laws while desecrating this symbol of our country, to the fullest extent permissible under any available authority."  Prosecuting Burning of the American Flag, 90 Fed. Reg. 42127, 42127 (Aug. 28, 2025).  Once police had brought prosecutors the case, it is hard to believe that they would feel free to defy the President by declining to charge Carey.  The Court therefore questions whether prosecutors could make an independent judgment of the merits of charging an

arrested flag burner, raising a strong possibility that Carey would not have been prosecuted but for his speech.

On the other side of the scale, it also seems plausible that Carey was charged because of the fire he lit, not the flag he burned.  Judge for yourself:

 

ECF No. 15 (Gov. Opp.) at 3

The fire is not contained.  Cf. Public Gathering Permit 18-1484 at 2, 4 (permit to burn Nazi/Confederate flag in Lafayette Park, which required burner to light flag inside 30-gallon metal trash can).  As seen in the photo on the left, Carey seems to have dumped isopropyl alcohol on the flag and left a trail of the fuel leading from the burning flag to the plastic alcohol bottle lying nearby.  See Incident Report at ECF p. 3 (Carey used "a bottle of isopropyl

alcohol . . . to light [the] flag . . . on fire").  The same photo shows what appears to be a pressurized canister of bug spray sitting a few feet from the flame.  Id. (Carey "use[d] an accelerant of bug spray").  Bystanders are nearby, and Carey did not put up any barriers to keep them away from the fire.  Cf. Public Gathering Permit 18-1484 at 5 (requiring Nazi/Confederate flag burner to use "caution tape and safety fence" to "establish a 20 foot perimeter" around fire).  Nor does Carey seem to have had anything with which he could put the fire out if something had gone wrong.  Cf. id. (mandating that flag burner have fire extinguishers).  And the fire damaged the bricks underneath it.  See Incident Report at ECF p. 3.

There is therefore strong but not decisive evidence suggesting that officials had both a vindictive motive and an independent justification to bring these charges.  The Court thus cannot confidently find on the current record whether this prosecution is actually vindictive.

It can, however, seek more information.  To obtain discovery in a vindictive-prosecution claim, defendants must clear a hurdle.  See United States v. Armstrong, 517 U.S. 456, 468 (1996) ("Discovery" into allegedly improper prosecution "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy[,] . . . thus requir[ing] a . . . rigorous standard for discovery in aid of such a claim.").  The D.C. Circuit has not announced what that hurdle is, but other circuits, as well as one court in this district, have held that it is the same bar defendants must clear to get discovery in a claim of selective prosecution: "[A] defendant must provide some evidence tending to show the existence of the essential elements of the defense." Sanders, 211 F.3d at 717 (quotation marks omitted); accord Bucci, 582 F.3d at 113; Wilson, 262 F.3d at 315; United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 175 (D.D.C. 2020).  That showing does not mean proof, but it requires "a colorable claim," Att'y Gen. of U.S. v. Irish People, Inc., 684 F.2d 928, 947 (D.C. Cir. 1982), which is itself a "demanding" standard.

Armstrong, 517 U.S. at 463.  Applying it to the elements of vindictive prosecution, Carey must offer some evidence tending to show that he would not have been prosecuted but for his protected speech.

Carey easily clears that bar.  The executive order directing prosecutors to find charges to pin on flag burners, not to mention officers' statements suggesting that the order might have played a role in Carey's prosecution, each creates a colorable claim that the Government is punishing Carey for exercising his First Amendment rights.  He has therefore shown enough evidence of actual vindictiveness to merit further inquiry.

If Carey instead travels the path of circumstantial evidence triggering a presumption, he arrives at the same place.  He has certainly established a presumption.  Any time a policy directs the Department of Justice to find charges to bring against people who exercise their rights in disfavored ways, the odds of vindictiveness are high indeed.  Imagine if the President signed an executive order instructing prosecutors to add all charges they possibly could against any defendant who demands a jury trial.  If a defendant exercised that right and prosecutors then acted consistently with the order, courts would have no problem smelling a risk of retaliation.  Carey's case thus fits a general fact pattern in which there is a realistic likelihood of vindictiveness.

The burden thus shifts to the Government to rebut the presumption with record evidence that justifies its action.  As discussed above, the record shows that Defendant lit a risky fire that seemed to damage federal property.  That gave the Government a good-faith basis to believe that Carey had violated federal law, which would justify prosecuting him.

The burden then shifts back to Carey to show that the justification is pretextual.  He has produced an executive order that singles out people who engage in disfavored speech and tells

prosecutors to find crimes to charge them with, as well as statements by officers that suggest this order may have influenced the Government's choices here.  The Court does not find that evidence decisive.  But it does find that it creates a colorable claim of pretext — which, once again, entitles Carey to proceed further.

IV.    **Conclusion**

Because the cited regulations governed Carey's conduct, the Court will deny his Motion to Dismiss for failure to state an offense.  On the other hand, it will hold a status hearing to assess next steps in determining whether his prosecution is vindictive.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  January 20, 2026